**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**DOUGLAS B. KOLPEK, as**
**EXECUTOR OF THE ESTATE OF**
**JERRY R. KOLPEK, DECEASED**                                    **PLAINTIFF**

**V.**                               **CASE NO. 5:21-CV-05116**

**UNITED STATES OF AMERICA**                                    **DEFENDANT**

**BENCH TRIAL OPINION AND ORDER**

This action came before the Court for a two-day bench trial on October 25 and 26, 2022. Plaintiff Douglas Kolpek, as Executor of the Estate of Jerry Kolpek ("Mr. Kolpek" or "Jerry"), deceased, brought this lawsuit under the Federal Tort Claims Act ("FTCA") after Mr. Kolpek died from metastatic prostate and bone cancer. Mr. Kolpek's cancer went untreated for six years because it was misdiagnosed as benign by Dr. Robert Levy, a pathologist at the Veterans Health Care System of the Ozarks ("VHSO"), a United States Department of Veterans Affairs ("VA") medical facility. Mr. Kolpek's Estate sued Defendant the United States of America for Dr. Levy's negligence and for the failure of the VA to prevent Dr. Levy's negligence.

Defendant has stipulated that Dr. Levy misdiagnosed Mr. Kolpek's cancer, the misdiagnosis fell below the applicable standard of care and proximately caused Mr. Kolpek's injuries and death, and Dr. Levy was acting in the course and scope of his employment with the VA when he misdiagnosed Mr. Kolpek. Therefore, the only issue for trial was the amount of damages to be awarded to Mr. Kolpek's Estate and beneficiaries.

1

In advance of trial, the parties submitted Stipulated Facts and Agreed Basis of Applicable Law (Doc. 67) and trial briefs (Docs. 69 & 70). At trial, Plaintiff introduced 16 exhibits and called five live witnesses: Special Agent Kris Raper of the VA Office of Inspector General; Mr. Kolpek's two children, Douglas Kolpek and Kristie Whitehill; and Mr. Kolpek's granddaughters, Emma Kolpek and McKenna Whitehill. Plaintiff also introduced the testimony of Mr. Kolpek's brothers, Larry Kolpek and Lanny Kolpek, by video deposition. Defendant did not introduce any exhibits nor call any witnesses.

Below are the Court's complete findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.[1]

## I.   FINDINGS OF FACT

### A.  Stipulated Findings of Fact

The Court makes the following findings of facts based on the parties' stipulations:

1.   Mr. Kolpek served in the U.S. Army and was honorably discharged. By virtue of his service, Mr. Kolpek was eligible to and did receive medical care from the VHSO in Fayetteville, Arkansas.

2.   Mr. Kolpek had a biopsy performed on January 30, 2012, at the VHSO. A total of six samples were taken, Parts A, B, C, D, E and F, and examined by Dr. Levy.

3.   Mr. Kolpek was informed the next day that there was no evidence of malignancy from any of the biopsy samples taken on January 30, 2012.

4.   In June 2018, the VA informed Mr. Kolpek that the 2012 biopsy results were wrong and two core samples from the biopsy were cancerous.

---

[1] To the extent any of the Court's findings of fact constitute conclusions of law, or mixed findings of fact/conclusions of law, the Court adopts those conclusions as if they had been restated as conclusions of law. The opposite also applies.

5.   In April 2019, the VA conducted a second review of Mr. Kolpek's January 30, 2012, biopsy results and issued a modified report. The modified report indicated that Parts A and C from the original biopsy were benign, but Parts B, D, E and F were identified with malignancies.

6.   Mr. Kolpek died on December 31, 2020, at the age of 83, from prostate cancer.

7.   Had Mr. Kolpek been properly diagnosed in 2012, Mr. Kolpek would have had a life expectancy of 89.5 years.

8.   Dr. Levy was acting in the course and scope of his federal employment at the VHSO on January 30, 2012, when he read the six samples from Mr. Kolpek's prostate biopsy and misdiagnosed Mr. Kolpek's prostatic tissues; Dr. Levy's misdiagnosis on January 30, 2012, deviated from the applicable standard of care; and this deviation from the standard of care on January 30, 2012, proximately caused Mr. Kolpek's injury and death.

9.   Mr. Kolpek timely filed an SF-95 with the VA on or about January 14, 2019, based on Dr. Levy's conduct and sought $0 in property damage, $25,000,000.00 for personal injury, and $0 for wrongful death for a total of $25,000,000.00.

10.  Following Mr. Kolpek's death, Douglas Kolpek was duly appointed as Executor of Mr. Kolpek's Estate by the Iowa District Court for Cerro Gordo County. Douglas Kolpek, as Mr. Kolpek's Executor, amended Mr. Kolpek's SF-95 to include a claim for wrongful death.

11.  On May 18, 2021, the VA determined that Mr. Kolpek's claim was not amenable to administrative resolution and denied it.

12.  Douglas Kolpek, on behalf of the Estate, timely filed his claim in this Court on June 25, 2021, under the FTCA. Count I of the Complaint brings a medical malpractice claim

against the United States and Count II brings a wrongful death claim against the United States under Ark. Code § 16-62-102 for Mr. Kolpek's surviving beneficiaries

13.  Mr. Kolpek is survived by his son Douglas Kolpek, his daughter Kristie Whitehill, and his two brothers Larry and Lanny Kolpek. All four are named beneficiaries to Mr. Kolpek's claim.

14. Mr. Kolpek had no out-of-pocket medical expenses after the cancer diagnosis because he continued to obtain his medical treatment from a VA medical facility in Des Moines, Iowa.

15. Mr. Kolpek's Estate seeks damages for Mr. Kolpek's loss of life, his conscious pain and suffering prior to death, his mental anguish prior to death, funeral expenses, and mental anguish damages for his four beneficiaries.

## B.  Findings of Fact as to Damages

Having reviewed all exhibits and trial testimony, the Court makes the following additional findings of fact:

16.  Mr. Kolpek was born on April 25, 1937.

17.  Mr. Kolpek grew up in Minnesota. Immediately upon graduating from high school, he went to work on the railroad and chose to become an engineer.

18.  His railroad career was detoured when, in 1960, he was drafted by the United States Army. After basic training, he specialized as a radio mechanic and quickly earned the respect of his commanding officers. He served two years in active service and was then subject to be recalled to active service for an additional four years. His father and grandfather also served in the military. Mr. Kolpek was honored to continue his family's tradition and served his country well.

19. Following his active military service, Mr. Kolpek returned to the railroad. In total, he spent 44 years as a railroad engineer and general chairman of the engineer union. He was passionate about his work and well-liked and respected by his peers.  He retired from the railroad in 1999 but maintained his love and interest in trains for the rest of his life.

20. Mr. Kolpek had a tight-knit family. He spoke and visited with his children, grandchildren, and brothers often. He was proud of his children and grandchildren and was interested and involved in their lives. Mr. Kolpek had life-long close relationships with his younger brothers, Larry and Lanny. They were long-time season ticket holders of the Minnesota Vikings and Minnesota Gophers football teams. Mr. Kolpek enjoyed tailgating and rooting for those teams with his family and friends. The brothers even followed the Vikings to two Super Bowl games—memories they very much treasured.

21. Mr. Kolpek led an active lifestyle.  He enjoyed fishing, boating, golfing, dinners with family, and an evening cocktail with his wife. In the first 15 years of his retirement, Mr. Kolpek and his wife, Jo, split their time between a cabin on a lake in Minnesota and a home in a golfing community in Arkansas.  Mr. Kolpek's wife was an avid golfer and boater too. They enjoyed doing these activities together, as well as with visiting and vacationing family members, including Mr. Kolpek's children, grandchildren, and brothers.

22. When Mr. Kolpek's wife was diagnosed with Alzheimer's in 2014, they moved back to Iowa and purchased a condo with a boat slip on Clear Lake.  Mr. Kolpek continued playing golf and boating until his shoulders and strength finally succumbed to the metastatic bone cancer that, unbeknownst to Mr. Kolpek, had been spreading through his body in the years following his (erroneous) cancer-free diagnosis in 2012.  In his final years, Mr. Kolpek could no longer swing a club or walk down the steps to the boat dock.

5

23. By the time Mr. Kolpek's cancer was correctly diagnosed in June 2018, it had metastasized to nearly every bone in his body—from the base of his skull to his femurs.

24. Federal investigators conducted two video-recorded interviews of Mr. Kolpek on February 26, 2019. The recordings were received in evidence (Pl.'s Exs. 1 & 2) and viewed in open court—providing the Court an unusual opportunity to assess the decedent's demeanor and credibility as he discussed his family relationships, career, leisure activities, and family history of longevity.

25. The Court heard first-hand of Mr. Kolpek's health and medical history, including how in 2018 he came to learn of Dr. Levy's errant diagnosis. Mr. Kolpek was distressed to learn that he had cancer as early as 2012 that had mistakenly gone undiagnosed. He was particularly upset that the disease had spread extensively to his bones. In his words, his late diagnosis was "a life changer." Mr. Kolpek also discussed his physical and mental feelings and plans for dealing with what was by then a terminal prognosis. Mr. Kolpek placed significant value on his life and independence, which declined precipitously in his final two years.

26. Mr. Kolpek was not a self-centered person, and he spoke of his predicament mostly in terms of how it impacted others. For example, at the time of his interview, Mr. Kolpek had become distressed by his inability to consistently see and attend to his wife—who had been placed in a memory care facility—and by his increasing reliance on others. Mr. Kolpek was troubled by the (perceived) burden he was becoming to family members who were taking time off work and, in the case of his son, traveling great distances to care for him.

27. The Court finds Mr. Kolpek was highly credible, humble, and honorable throughout the investigative interviews. Mentally, he was angered by Dr. Levy's criminal conduct and the suffering it brought to both him and other veteran patients. Nevertheless, Mr. Kolpek was respectful and appreciative of his VA doctors in Des Moines and maintained his support for the VA. Mr. Kolpek gave an accurate account of his life story and current plight. If anything, he tended to downplay and deflect his personal adversities that resulted from the final hand he had been wrongly dealt. Defendant's assessment appears similar. Its counsel stated in closing argument that, "Mr. Kolpek testified honestly and openly about the cancer misdiagnosis, the impact it had on him, relationship with his family, and his background."

28. Mr. Kolpek was attentive to his own health and kept close track of his health metrics. After being diagnosed with cancer, he carefully monitored his prostate-specific antigen levels, a metric that is elevated in people with prostate cancer. Mr. Kolpek placed great value on extending his life and was willing to do whatever his doctors recommended to do so.

29. After Mr. Kolpek's diagnosis, his doctors placed limitations on his activities. His doctors instructed him not to lift anything greater than four pounds or leave his home unless necessary.

30. The metastasis of Mr. Kolpek's cancer caused him significant and prolonged pain. The pain began at least as early as January 2017 and continued, in varying degrees of severity, until Mr. Kolpek's death in December 2020. *See* Pl.'s Ex. 16. The pain was particularly bad in his shoulders, ribcage, and neck, and was most severe during his final

year of life. In July 2020, Mr. Kolpek reported he had pain in his neck that he rated a 30

on a scale of one to ten. *Id.* at p. 12. That pain was even worse when he turned his neck.

31. Mr. Kolpek experienced other symptoms from his cancer and cancer treatment. He

had fatigue, nausea, and edema—swelling due to excess fluid—of his legs and groin. *Id.*

at p. 6. He also suffered from constipation, a condition exacerbated by the pain medication

he had to take.

32. Mr. Kolpek's pain and medical restrictions prevented him from visiting his wife as

frequently as he wanted to and prevented him from doing his favorite life activities, such

as golfing and fishing.

33.  During the final years of his life, Mr. Kolpek took pain killers on a daily basis to control

the pain from his disease. The pain killers limited his ability to drive an automobile.

34.  Mr. Kolpek's disease affected his balance. At one point, he fell at home and broke his

wrist.

35.  Mr. Kolpek's disease—and the limitations it brought—caused Mr. Kolpek grief and

distress. Being largely home bound and unable to visit family and friends or engage in his

favorite activities took a toll on his mental health, particularly in the last year of his life.

36. During the final months of Mr. Kolpek's life, his family had limited contact with him

due to the COVID-19 pandemic.

37. Mr. Kolpek rebounded to some extent in 2019 after receiving palliative treatment. He

gained weight and "looked better." But the cancer's retreat was short-lived, and his

condition became progressively worse during 2020.

38. Mr. Kolpek entered the hospital in mid-December 2020. Because of the hospital's

COVID-19 restrictions, Mr. Kolpek spent his final Christmas holiday alone, expect for a

brief video call with family. He was transferred to hospice care a few days later and passed away on December 31.

39. Mr. Kolpek had a close relationship with his son Doug, daughter Kristie, and brothers Lanny and Larry. All four testified at trial. The Court evaluates their testimony and demeanor as being very credible. Mr. Kolpek's granddaughters, Emma Kolpek and McKenna Whitehill, also provided powerful testimony that buttresses the Court's conclusions about Mr. Kolpek's strong and positive character traits, love of life, and close family bonds. All of the family witnesses testified credibly and consistently about Mr. Kolpek's decline over the last few years of his life, the loss of his active lifestyle, and the resulting mental anguish to Mr. Kolpek and his children and brothers.

40. Doug and his father attended football games, golfed, and often spent time together. Doug was one of his father's primary caregivers toward the end of his life. Doug was in charge of paperwork for his father and drove his father to appointments. Doug has experienced some sleepless nights and weight loss since his father's death. He has not been diagnosed with depression or anxiety as a result of his father's death.

41. Kristie lived a short drive from her father's home and saw him frequently. Prior to his illness, Mr. Kolpek visited his daughter's home often and helped with household chores, such as tree trimming. She also served as one of her father's primary caregivers during the final years of his life. Kristie was with her father when he passed away. Kristie has experienced sleepless nights, crying spells, and sadness since her father's death. She has not been diagnosed with depression or anxiety as a result of her father's death.

42. Doug and Kristie suffered distress due to the knowledge that their father could have lived a longer life and suffered much less pain had his cancer been correctly diagnosed in 2012.

43. Beyond their shared love of sports, Mr. Kolpek and his brothers, Larry and Lanny, spent significant time together and communicated frequently throughout their lives. In the last few years, all three brothers were diagnosed with prostate cancer, and they spoke often about their conditions and treatments. Jerry and Larry had a particularly close relationship. Larry, who is three years younger than Jerry, worked alongside him on the railroad for more than 40 years. During the final years of Jerry's life, they lived close and spent time together about twice a week. They golfed, fished, and went to lunch together. Larry also drove Jerry to some of his appointments. Larry has experienced some sleeping trouble and crying spells since his brother's death. Lanny, who is ten years younger than Jerry, experienced sleepless nights for several months and intermittent crying spells for two months. Neither brother has been diagnosed with depression or anxiety as a result of their brother's death.

44. Mr. Kolpek's Estate spent $7,061.80 on his funeral. Defendant previously reimbursed $2,000 in funeral expenses to the Estate.

## II.  CONCLUSIONS OF LAW AND DAMAGES FINDINGS

The parties agree on all applicable damages law. *See* Doc. 67, pp. 3–6. The parties' only dispute is over the amount of compensatory damages due to Mr. Kolpek's Estate and wrongful death beneficiaries.

The FTCA waives the United States' sovereign immunity to civil tort claims. In such actions, the FTCA provides that "[t]he United States shall be liable . . . in the same manner

and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Federal courts therefore apply state substantive law—Arkansas's, in this case—to determine damages. *See Wilcox v. United States*, 881 F.3d 667, 672 (8th Cir. 2018). However, the FTCA places certain limits on the damages a plaintiff may recover under state law. The FTCA does not allow punitive damages or pre-judgment interest, *see* 28 U.S.C. § 2674, and a plaintiff normally cannot recover damages in excess of the amount requested in his administrative claim presented to the applicable federal agency, *see* 28 U.S.C. § 2675(b).

Arkansas law permits the estate of a deceased person in a medical malpractice action to recover damages for economic and noneconomic losses. *See* Ark. Code Ann. § 16-114-208(a). Economic losses may include the reasonable value of funeral expenses. Ark. Model Jury Instr., Civil AMI 2216. Noneconomic losses may include loss of life, physical pain and suffering, and mental anguish suffered prior to death. *See McMullin v. United States*, 515 F. Supp. 2d 914, 917–928 (E.D. Ark. 2007), *as revised* (Oct. 22, 2007).

The Arkansas survival statute provides for loss-of-life damages. It states that "[i]n addition to all other elements of damages provided by law, a decedent's estate may recover for the decedent's loss of life as an independent element of damages." Ark. Code Ann. § 16-62-101(b). Loss of life "represents the decedent's loss of the ability to carry on and enjoy life's activities. The award should reflect the life expectancy of the decedent, his recreational and social activities, his service to others, and the meaning he would have placed on life." 1 Howard W. Brill & Christian H. Brill, Arkansas Law of Damages § 34:3 (Nov. 2021) (collecting Arkansas cases). To prove loss-of-life damages, the plaintiff "must present *some* evidence that the decedent valued his or her life from which a jury could

11

infer and derive that value and on which it could base an award of damages." *One Nat. Bank v. Pope*, 272 S.W.3d 98, 102–03 (2008) (emphasis in original). Here, Defendant concedes Mr. Kolpek's Estate has met its burden of proof for loss-of-life damages.

An estate may also recover for the decedent's pain and suffering and mental anguish. *See* Ark. Model Jury Instr., Civil AMI 2205. The Arkansas Supreme Court "has held that there is no definite and satisfactory rule to measure compensation for pain and suffering; the amount of damages must depend on the circumstances of each particular case." *Advocat, Inc. v. Sauer*, 353 Ark. 29, 44–45 (2003). The award should represent "consideration of the pain and suffering necessarily endured" and "must be fair and reasonable, free from sentimental or fanciful standards, and based upon the facts disclosed." *Id.* at 47 (quoting 2 Jacob A. Stein, Stein on Personal Injury Damages § 8:8 (3d ed.1997)). Courts generally award pain and suffering and mental anguish damages as a single, combined amount. *See, e.g.*, *McMullin*, 515 F. Supp. 2d at 919 ("The Court will award the estate $10,000.00 for Garett's conscious pain and suffering and mental anguish experienced prior to his death."); *Gonzalez v. United States*, 2010 WL 4054246, at *9 (E.D. Ark. Oct. 15, 2010), *aff'd*, 681 F.3d 949 (8th Cir. 2012) ("Plaintiff is thus awarded $285,000 for . . . pain and suffering and mental anguish . . . .").

Arkansas law further permits a deceased person's beneficiaries to recover for the mental anguish they suffered as a result of their family member's death. Damages for the beneficiaries of a deceased party are governed by Arkansas's wrongful death statute, Ark. Code. Ann. § 16-62-102, which allows a deceased person's surviving beneficiaries—spouse, children, parents, and siblings—to recover "for pecuniary injuries, including a spouse's loss of the services and companionship of a deceased spouse and any mental

12

anguish resulting from the death to the surviving spouse and beneficiaries of the deceased." *Id.* § 16-62-102(f)(1). Mental anguish damages "include grief normally associated with the loss of a loved one." *Id.* § 16-62-102(f)(2).

Arkansas courts look to a number of factors to determine beneficiaries' mental anguish damages: (1) the duration and the intimacy of the relationship and ties of affection between the decedent and the survivor; (2) the frequency of association and communication between the decedent and the survivor; (3) the attitude between the decedent and the survivor; (4) the duration and intensity of the survivor's grief; (5) the survivor's maturity or immaturity; (6) the nature of the decedent's death; (7) whether the survivor had any troubled sleep over an extended period, (8) extreme or unusual nervous reactions to the decedent's death, or (9) extended crying spells; (10) whether the decedent's death had any adverse effect on the survivor's work or school; (11) any changes of personality for the survivor; (12) whether the survivor had any physical manifestations of grief like weight loss or other physical symptoms; and (13) the decedent's age and life expectancy. *Kelly v. Wiggins*, 291 Ark. 280, 294–95 (1987).

\* \* \*

Having considered the applicable law, the finding of facts made above, the evidence submitted at trial, and the comparator cases submitted by the parties, the Court awards damages as follows:

**To Douglas Kolpek, in his capacity as Executor of the Estate of Jerry Kolpek:**

| | |
|---|---|
| Loss of Life: | $1,600,000.00 |
| Pain, Suffering, and Mental Anguish: | $2,400,000.00 |
| Funeral Expenses: | $5,061.80 |

13

**To Jerry Kolpek's Beneficiaries for Mental Anguish:**

| | |
|---|---|
| Douglas Kolpek: | $300,000.00 |
| Kristie Whitehill: | $300,000.00 |
| Larry Kolpek: | $60,000.00 |
| Lanny Kolpek: | $50,000.00 |

### III. CONCLUSION

**IT IS THEREFORE ORDERED** that Mr. Kolpek's Estate and beneficiaries be awarded damages in the collective sum of $4,715,061.80, as specified above. The Court will enter judgment for the Estate and beneficiaries contemporaneously with this opinion.

**IT IS SO ORDERED** on this 27th day of October, 2022.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE